**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

HARLIE E. SMITH,       )
     Plaintiff,       )
                 )       Civil Action No. 3:07-CV-0611
v.                   )       Judge Wiseman/Brown
                 )
MICHAEL ASTRUE,      )
Commissioner of Social Security,   )
     Defendant.       )

To:    The Honorable Thomas A. Wiseman, Jr., Senior Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final

decision of the Commissioner of Social Security denying Plaintiff Disability Insurance Benefits

("DIB") as provided under Title II of the Social Security Act as amended.  The case is currently

pending on plaintiff's motion for judgment on the administrative record.  (Docket Entry No. 15).

For the reasons stated below, the Magistrate Judge recommends that plaintiff's motion for judgment

be DENIED, and that the decision of the Commissioner be AFFIRMED.

## I.  INTRODUCTION

Plaintiff protectively filed his application for DIB and Supplemental Security Income ("SSI")

on May 9, 2003, alleging that he became disabled and unable to work on September 11, 1999.  (Tr.

17, 49).  Plaintiff alleged disability due to left shoulder and hand impairment, sleep apnea, and a

back problem.  (Tr. 69).  Plaintiff's application was denied initially.  (Tr. 28-30 ).  Upon

reconsideration, Plaintiff was found to be disabled for SSI purposes as of May 1, 2004.  (Tr. 31-34).

However, because Plaintiff's disability insurance status expired as of December 31, 2002, Plaintiff

1

was found to be not eligible for DIB. (Tr. 31-34). Plaintiff then filed a request for a hearing by an Administrative Law Judge ("ALJ") alleging that he had been disabled since 2001. (Tr. 41).[1] On May 5, 2006, a hearing was held during which Plaintiff claimed again that he had been disabled since 1999. (Tr. 597-608). On August 25, 2006, the ALJ issued a decision denying Plaintiff's claim. for DIB. (Tr. 17-20).

 The ALJ made the following findings:

1.　　The insured status requirements of the Act were met as of the alleged onset date, September 11, 1999, and continued to be met only through December 31, 2002, the date last insured (DLI).

2.　　No substantial gainful activity has been performed since the alleged onset date.

3.　　The claimant did not have an impairment or combination of impairments through the DLI that significantly limited basic work-related physical or mental functioning for any period of time approaching 12 consecutive months.

4.　　The claimant did not have a severe impairment by the DLI.

5.　　The subjective allegations of an onset of disability by the DLI are not credible.

6.　　The claimant was not under a disability, as defined under the Social Security Act, at any time through the DLI. (Tr. 20).

On June 29, 2005, Plaintiff sought review from the Appeals Council. (Tr. 19). The Appeals Council denied plaintiff's timely request for review of the ALJ's decision, thereby rendering it decision the final decision of the Commissioner. (Tr. 8-11). This civil action was thereafter timely filed and the Court has jurisdiction. 42 U.S.C. § 405(g). If the Commissioner's findings are supported by substantial evidence, based on the record as a whole, then these findings are conclusive. Id.

---

　　　　[1]Plaintiff's initial application states an onset date in 1999. However, Plaintiff's request for a hearing clearly states several times that he had been disabled since 2001. (Tr. 41).

2

## II.  REVIEW OF THE RECORD[2]

Plaintiff was born on August 29, 1949, making him 57 years old at the hearing.[3]  Plaintiff has a sixth grade education and to date has consistently maintained a commercial driver's license.  He has past relevant work as a tractor trailer truck driver.  (Tr. 18, 70, 602).  The ALJ found that Plaintiff had not engaged in substantial gainful activity since September 11, 1999.  (Tr. 18).

On June 26, 2000, Plaintiff was treated by Dr. Robert Cowden for severe sleep apnea.  (Tr. 195).  A sleep study confirmed the presence of a septal deviation and some significant tonsillar enlargement.  As recommended, Plaintiff underwent a tonsillectomy and septoplasty on July 19, 2000 to resolve his issues.  (Tr. 195).  During later treatment on September 14, 2001, it was noted that Plaintiff's sleep apnea had been corrected by surgery.  (Tr. 235).

On September 11, 2000, Plaintiff presented to the Sumner Regional Medical Center and was treated by Dr. Charles Ruark, having injured his left shoulder when a refrigerator[4] slipped and struck him at work.  (Tr. 197, 204).  The examination revealed that there were no fractures or dislocations, the cervical spine was normal, and there was degenerative change in the mid

---

[2]In the future, counsel for both parties are reminded to submit a *complete* review of the record.  Submitting misleading/incomplete versions of the facts at hand does not assist the Court in rendering a decision nor does it assist the credibility of their arguments.

[3]Plaintiff testified at the hearing that he was 56.  (Tr. 601).  However, given his recorded birth date, this was a misstatement.  (Tr. 59).

[4]There were later reports that the work related injury actually involved cases of bottled water and a truck door, rather than a refrigerator, falling/hitting on the left side of his neck and left shoulder.  (Tr. 216, 336).  The Magistrate Judge is unsure of how the accident actually occurred.  However, for purposes of evaluation, the Magistrate Judge will focus on Plaintiff's injuries and treatment rather than the cause, other than to note that it was a work related trauma to Plaintiff's left neck, shoulder as well as his back.

3

lower thoracic spine. (Tr. 206-207). At that time, Plaintiff complained of numbness and tingling in three fingers on his left hand and that his left shoulder and his left arm were in quite of bit of pain. (Tr. 204). Plaintiff, after film revealed the left clavicle, left shoulder and C-spine were normal, was placed in a hard cervical collar. (Tr. 205). Dr. Ruark opined that Plaintiff had a brachial plexus or peripheral nerve injury to the left neck and ordered an MRI of his neck and a neurosurgical evaluation. (Tr. 205).

That same day, Plaintiff was treated at the Vanderbilt University Medical Center Emergency Room by a neurology attending physician who found that Plaintiff had a soft tissue injury and prescribed Motrin and Lortab for pain. (Tr. 2001). An MRI of the cervical spine was found to be negative for any injury, although there were early degenerative changes with minor osteophytes present at C3, C4, and C5, which did not significantly compromise the spinal canal and resulted in mild left foraminal stenosis. (Tr. 201). The MRI of the neck was found to be negative for any injury. (Tr. 201). The emergency room physician opined that Plaintiff should take two days off work and then return to work with restricted duties for two weeks. (Tr. 200). Plaintiff was also instructed to seek follow-up neurological care and have an EMG performed. (Tr. 200).

On September 26, 2000, Dr. Paulo C. Acosta performed an initial neurological consultation. (Tr. 212). Plaintiff reported to Dr. Acosta that on September 11, 2000, cases of bottled water fell on the left of his head and his left shoulder and that he was knocked down and dazed. (Tr. 216). Plaintiff reported pain in the neck, head, left shoulder and left arm. (Tr. 216). Dr. Acosta opined that Plaintiff had a cervical and shoulder sprain that required physical therapy and prescribed Amitriptyline, an antidepressant, and Naprosyn, used to relieve pain and

4

inflammation.  (Tr. 217).

On October 11, 2000, Plaintiff was seen again by Dr. Acosta for neck, left shoulder, and arm pain.  (Tr. 212).  Plaintiff reported to Dr. Acosta that he had inadvertently omitted in the initial consultation to report that he was also spun around when he was hit by a refrigerator door and twisted his back.  (Tr. 212). Plaintiff stated that his sternum, low back, and legs had also been in pain in addition to his neck and shoulder and that he had a constant throbbing headache. (Tr. 212).  Plaintiff reported that he had been receiving no relief with physical therapy.  (Tr. 212).  Dr. Acosta continued to prescribe physical therapy, Amitriptyline, and Naprosyn. Additionally, a nerve conduction study and EMG indicated that Plaintiff had mild to moderate carpal tunnel syndrome in his left hand.  (Tr. 214-215).

On October 27, 2000, Plaintiff was again treated by Dr. Acosta who, after reviewing the results of a head and spine MRI conducted that same day, opined that Plaintiff had mild to moderate lumbar spinal stenosis, mild lumbar spondylosis, pectoralis muscle atrophy, a cervical and shoulder sprain, as well as pain in the sternum, ribs, back and legs.  (Tr. 208-209).  Dr. Acosta continued to prescribe physical therapy, Amitriptyline, and Naprosyn.  (Tr. 209).

On November 17, 2000, Plaintiff was treated by neurosurgeon Dr. Arthur Cushman.  (Tr. 228-230).  Plaintiff reported to Dr. Cushman that on September 11, 2000, he was opening the door of a soft drink truck when a number of bottles fell out striking him in the chest, causing him to fall to the ground and briefly lose consciousness.  (Tr. 228).  Dr. Cushman opined that the CT scan of the brain was normal, the MRI of the neck shows some minor degenerative changes but specifically no evidence of a herniated disc or acute injuries, the CT scan of the lumbar spine showed some mild to moderate spinal stenosis and degenerative changes but certainly nothing

5

acute, and that the EMG showed a mild, left carpal tunnel syndrome. (Tr. 230). Dr. Cushman recommended a Medrol Dosepack for Plaintiff's pain, noting that Plaintiff's subjective complaints "seem to be somewhat out of proportion to the physical findings. He may return to work at any time if there are sedentary duties available which would not require him to lift with the upper extremity, stand or walk for prolonged periods on hard surfaces or repetitively bend or scoop." (Tr. 230, 231). Dr. Cushman concluded that there was a recovered mild cerebral concussion, cervical strain with mild underlying degenerative changes, shoulder injury, injury to the left lower brachial plexus, and low back strain with underlying degenerative disc disease. (Tr. 230).

On December 1, 2000, Dr. Cushman again treated Plaintiff. Dr. Cushman reported that Plaintiff still complained of a lot of neck pain even though an MRI scan of the cervical spine and brachial plexus revealed no significant abnormalities. (Tr. 224). Dr. Cushman further reported that while the MRI scan of the shoulder was positive, Plaintiff seemed to have a lot of complaints that where not supported by objective findings. (Tr. 224). Dr. Cushman then recommended a neck exercise program and an evaluation by Dr. J. Wills Oglesby, an orthopedic physician, regarding his shoulder problem. (Tr. 224). Dr. Cushman also recommended that Plaintiff remain on medical leave, having previously recommended sedentary only duties, until the orthopedic evaluation. (Tr. 225, 230-231).

On December 27, 2000, Plaintiff reported to Dr. Oglesby that his injury occurred at work in September when the door to his truck hit him in his chest and then several large water bottles fell on him. (Tr. 336). Dr. Oglesby opined that Plaintiff "has had a solid nonsurgical management program" and "has had enough time for the pain to resolve if there was not

significant structural damage." (Tr. 336). Dr. Oglesby discussed with the Plaintiff that even with surgery, Plaintiff would "not improve enough to get back to his original employment." (Tr. 337). Dr. Oglesby scheduled arthoscopic surgery for January 15, 2001, refilled Plaintiff's Lortab prescription, and recommended that Plaintiff remain on medical leave until the surgery. (Tr. 337).

On January 15, 2001, Dr. Oglesby performed an arthroscopy and acromioplasty on Plaintiff's left shoulder, finding a tearing of the anterior and superior labrum and a flap tear of the deep surface of the cuff. (Tr. 335). There were no apparent complications with the surgery and Dr. Oglesby recommended that Plaintiff remain out of work until the next office visit in two weeks. (Tr. 335). Dr. Oglesby further opined that he anticipated at that point, he would recommend light duty work and physical therapy. (Tr. 335).

Two weeks later, on January 29, 2001, Dr. Oglesby found that "although [Plaintiff] has full motion of the shoulder in rotation with his elbow by his side when distracted, when paying attention he actively splints against elevation of his elbow 30 degrees from his side." (Tr. 334). After injecting Plaintiff with Aristocort and Marcaine to subdue any inflammation present, Dr. Oglesby referred Plaintiff to physical therapy and released Plaintiff to light duty work.

Plaintiff participated in physical therapy from February 5, 2001, through December 4, 2001. (Tr. 261-301). During this time, Plaintiff also continued his treatment with Dr. Oglesby. On February 26, 2001, Dr. Oglesby noted that Plaintiff had "done very well in therapy" and was "quite comfortable and is ready to advance to the final phase of strengthening for his shoulder." (Tr. 333). Dr. Oglesby also noted that Plaintiff's back and hands were "still giving him trouble." (Tr. 333). Dr. Oglesby kept Plaintiff on light duty work with a five pound lifting limitation for

7

an additional four weeks, opining that he anticipated "that from a shoulder standpoint [Plaintiff] could work without restrictions" after that time. (Tr. 333).

Four weeks later, on March 28, 2001, Plaintiff complained to Dr. Oglesby about increasing pain in his shoulder, despite the fact that x-rays did not show any reformation of calcium deposition in the shoulder and there were no objective signs of a problem that would explain his pain. Further, Dr. Oglesby found that Plaintiff had an excellent range of motion. (Tr. 332). Dr. Oglesby opined that Plaintiff had "just worked aggressively and stirred up some inflammation of the shoulder," placing him on a Medrol Dosepak while continuing physical therapy and the light work restriction. At that time, Dr. Oglesby requested a follow-up EMG to treat Plaintiff's hand. (Tr. 332).

Approximately four weeks later, on April 30, 2001, Dr. Oglesby opined that while Plaintiff continued to complain of tingling in the ulnar nerve distribution, his EMGs were normal for the ulnar nerve, showing only non-clinical mild left median nerve derangement. (Tr. 331). Dr. Oglesby also noted that Plaintiff's "shoulder is doing great" and that Plaintiff could "work without restrictions, effective tomorrow," May 1, 2001. (Tr. 331).

Plaintiff then returned to work for approximately one week. On May 8, 2001, Plaintiff re-injured his shoulder when he was closing the door on a trailer and heard a loud pop in his shoulder. (Tr. 328-330). On May 23, 2001, Dr. Oglesby noted that Plaintiff's left shoulder exhibited a new prominence at the AC joint and that x-rays showed that the AC joint had sublexed. (Tr. 329). Dr. Oglesby opined that Plaintiff had a sprained AC joint in his left shoulder with possible damage to his underlying rotator cuff, which was found to be partially torn at surgery in January. (Tr. 329). Dr. Oglesby concluded that Plaintiff must wear a sling,

was restricted to light duty work with essentially no use of the left arm, and would undergo additional testing to determine if the cuff was torn and additional surgery was needed. (Tr. 329).

One week later, on May 30, 2001, Dr. Oglesby opined that the MRI, which was not performed with gadolinium so the accuracy was somewhat compromised, did not show any evidence of additional nerve damage, although there was some concern about the labrum. (Tr. 328). Dr. Oglesby further noted that the rotator cuff appeared to be intact. (Tr. 328). However, Plaintiff's reported pain did not improve so on June 21, 2001, Dr. Oglesby performed additional surgery, finding "no evidence of new internal injury to the joint, just the AC joint injury." (Tr. 326). Dr. Oglesby restricted Plaintiff from work for two weeks, anticipating physical therapy and light work duty thereafter. (Tr. 326). Approximately two weeks later, on July 3, 2001, Plaintiff was allowed to return to "one-handed work only with minimal use of his left arm; otherwise light duty" and was started on a therapy program. (Tr. 325).

Throughout July and August 2001, Dr. Oglesby noted that Plaintiff was "doing very well" in physical therapy and was "delighted with the motion he exhibits actively and passively." (Tr. 323). However, during this time, Dr. Oglesby noted that strength was a limiting factor and recommended that Plaintiff remain out of work during this time period. (Tr. 323, 324).

On September 19, 2001, Plaintiff underwent left carpal tunnel surgery by Dr. William Bacon, while still under the care of Dr. Oglesby. (Tr. 238). On September 25, 2001, Dr. Oglesby noted that Plaintiff was "coming along very well in therapy," that he would continue therapy to build strength, and that his left carpal tunnel surgery was an "excellent early resolution of his hand symptoms." (Tr. 321). Further, from the end of September 2001 through November 2001, Plaintiff reported to Dr. Bacon that his fingers no longer felt numb, that his

hand felt a lot better, and that he could move his hand all the time. (Tr. 250-251). Further, on November 6, 2001, Plaintiff reported that he no longer had an difficulty with his hand and that his only problem now was his left shoulder. (Tr. 247). Dr. Bacon observed that Plaintiff had good sensation in all fingers, good grip strength, and a fully range of wrist and finger motion. (Tr. 247-248).

Around that same time, on October 30, 2001, Plaintiff was reported to be lifting 50 pounds up to shoulder height. (Tr. 320). On November 26, 2001, Plaintiff underwent a functional capacity evaluation with physical therapist David Davenport who noted that Plaintiff "was self-limited on most of the material handling activities" and that, as Plaintiff did not demonstrate a full and consistent effort, he was unable to determine Plaintiff's actual level of work ability. (Tr. 254, 254-260). Mr. Davenport noted that the pain rating indicated by the Plaintiff "did not appear to correlate with the degree of muscle guarding and postural deviation exhibited." (Tr. 254, 260). Plaintiff estimated his lifting ability at 45 pounds. (Tr. 256).

On December 5, 2001, Dr. Oglesby noted that while Plaintiff reported that his shoulder was sore, he was releasing him to work with a lifting limit of 50 pounds maximum, 50 pounds floor to waist, 30 pounds waist to chest, and 12 pounds overhead. (Tr. 319). Dr. Oglesby found that Plaintiff could drive heavy equipment. (Tr. 319).

On January 16, 2002,[5] Plaintiff reported to Dr. Oglesby that he had been told that work with these restrictions was not available. (Tr. 318). Dr. Oglesby concluded that the restrictions enumerated one month prior were permanent and that these restrictions should also include only

_____

[5]Plaintiff incorrectly states that Dr. Oglesby did not release Plaintiff to work until this date. (Docket Entry 16, Page 3). However, it is clear from the treatment notes, that Dr. Oglesby released Plaintiff in December 2001. (Tr. 319).

10

occasional overhead work.  (Tr. 318).

In April 2002, Plaintiff began to report low back, left shoulder and neck pain to Dr. Verna Bain, for which she prescribed Lortab and Xanax.  (Tr. 416-418).  On May 2, 2002, Plaintiff reported to Dr. Bain that he had been back to work, taking 2-3 pain pills a day as well as a Xanax per day.  (Tr. 416).  On June 27, 2002, an MRI of Plaintiff's cervical spine revealed "very mild degenerative changes with no acute injury noted."  (Tr. 431).  Further, on that same day, an MRI of Plaintiff's lumbosacral spine revealed "mild multilevel degenerative disc disease changes" with "no acute injury noted."  (Tr. 430).  Additionally, an MRI of the left shoulder demonstrated "mild degenerative changes of the acromioclavicular joint with suggestion of supraspinatus tendinosis and subacromial bursitis."  (Tr. 429).  On July 10, 2002, an MRI of Plaintiff's lumbar spine indicated mild degenerative changes with the most pronounced findings of a mild central spinal stenosis at L2-L3 and clustered fluid signal collections at the facet joint level at L4-L5.  (Tr. 428).  Dr. Bain reported that, "These latter findings are of uncertain though doubtful clinical significance."  (Tr. 428).

Plaintiff continued his treatment from July 2002 through November 2002 with Dr. Bain. (Tr.  407-410).  In September 2002, Dr. Bain referred Plaintiff to a neurosurgeon.  (Tr. 409). During this time, Plaintiff continued to report low back pain for which Dr. Bain continued Lortab and Xanax treatment as well as Valium.  (Tr. 410).   However, in October 2002, Dr. Bain discontinued prescribing Lortab, Xanax, and Valium when she discovered that Plaintiff was a truck driver stating that Plaintiff had never told her he was a truck driver.  Dr. Bain also noted at the time she discontinued prescribing the above medications that Plaintiff had "seeking behavior."  (Tr. 408).  Dr. Bain also advised Plaintiff that he needed to keep his appointment

11

with the neurosurgeon. (Tr. 408, 410). On November 27, 2002, Dr. Bain noted that Plaintiff was a noncompliant patient who had a multitude of doctors and no continuity of care. (Tr. 407).

On December 31, 2002, Plaintiff's disability insurance status expired.

On January 7, 2003, Plaintiff continued to report lower back pain as well as pain in his lower left leg to Dr. Bain. (Tr. 406). Dr. Bain noted that Plaintiff continued to ask for Xanax, which she refused to prescribe. (Tr. 406). Further, Plaintiff advised that he had an appointment with a neurosurgeon, Dr. Douglas Matthews, in February. (Tr. 406). Dr. Bain advised Plaintiff to keep this appointment. (Tr. 406).

On February 12, 2003, Plaintiff began his treatment with Dr. Matthews. (Tr. 463). At that time, Dr. Matthews ordered a second MRI of Plaintiff's lumbar spine to see if there were any changes near the area of his pain. (Tr. 470-476). When reviewing this MRI, radiologist Dr. Paul C. Nau, M..D., noted a "moderate anterior protrusion of the disc" and anterior spondylolysis at the L1-2 level, a "very mild posterior bulge of the disc" and a narrowed disc at the L2-3 level, a "very mild posterior annular with mild to moderate anterior bulge" at the L3-4 level, a normal disc at the L4-5 level, and a "very slight posterior bulge of the disc without disc herniation" and a small bilateral partial defect without evidence of spondylolisthesis at the L5-S1 level. (Tr. 470, 471, 476). Two weeks later, on February 26, 2003, Dr. Matthews also reviewed this MRI and made the same findings: that flexion extension films demonstrated a partial defect at L5 bilaterally without spondylolisthesis and with concordant L5-S1 mild degenerative disc. (Tr. 462). Dr. Matthews suggested a trial period of wearing a back brace and rest and ordered Plaintiff to remain off work for two months. (Tr. 462). At that time, Dr. Matthews also

12

mentioned that, "Consideration in the future will be made for pedicle screw fixation with posterolateral fusion and anterior lumbar fusion L5-S1." (Tr. 462).

Approximately two months later, on April 23, 2003, Dr. Matthews found that, "As he is symptomatically improved with bracing and a trial of rest, it is reasonable for [Plaintiff] to return to work at the very least at light duty, no lifting greater than 25 pounds, no sitting greater than 4 hours at a time without at least a 15 minute rest." Dr. Matthews also stated that he was pleased with Plaintiff's progress. (Tr. 461).

The next day, April 24, 2003, and again on May 7, 2003, Plaintiff was seen by Dr. Bain who noted that Plaintiff had "degenerative disc lumbar" for which she prescribed Lortab, at a lower does than previously prescribed, although Plaintiff requested the level to remain the same. (Tr. 404, 405).

On May 19, 2003, Plaintiff reported to Dr. Matthews that his back and leg pain had gotten worse and that the back brace only minimized the pain to about 20%. (Tr. 460). At that time, Dr. Matthews recommended surgery to the Plaintiff, informing Plaintiff that he may require additional surgery after the first. (Tr. 460).

On May 29, 2003, Plaintiff underwent a microscopic decompressive lumbar laminectomy at L5-S1 and pedicle screw fixation at L5-S1 due to instability, radiculopathy and mechanical back pain. (Tr. 390-392, 457-459). The surgery was completed without complication and Plaintiff was prescribed Vicodin, Medrol, Lortab, Keflex, and Valium. (Tr. 390, 458).

On June 25, 2003, Plaintiff reported to Dr. Matthews that he had only mild back soreness although he did still take a "fair amount of pain medication." (Tr. 456). Dr. Matthews noted that Plaintiff had "done well from his lumbar surgery." (Tr. 456). Dr. Matthews decreased

13

Plaintiff's pain medication to Lortab, eliminated Valium, and placed him on Flexeril and Naprosyn, noting that he was "pleased with [Plaintiff's] progress." (Tr. 456). Dr. Matthews also noted that consideration for anterior lumbar interbody fusion surgery would be made after another six weeks. (Tr. 456).

After treatment for infection July, on August 18, 2003, Plaintiff reported that he was "at least 50 % better with regards to back pain" and took only the occasional Lortab. (Tr. 453-454). Dr. Matthews noted that he was pleased with Plaintiff's progress, that Plaintiff could discontinue using his back brace and that Plaintiff had full strength of his lower extremities. (Tr. 453).

On September 23, 2003, Dr. Robert Burr, a Disability Determination Services (DDS) physician, completed a Physical Residual Functional Capacity Assessment (PRFC), finding that Plaintiff was capable of lifting 50 pounds occasionally and 25 frequently, could stand and/or walk about 6 hours in an 8 hour workday; could sit about 6 hours in a an 8 hour workday and could push or pull to an unlimited degree. (Tr. 439). Dr. Burr further opined that Plaintiff could frequently climb, balance, stoop, kneel, crouch and crawl. (Tr. 440).

On October 6, 2003, Plaintiff returned to Dr. Matthews stating that he had back spasms and pain that radiated to his hips. (Tr. 452). Dr. Matthews examined the Plaintiff finding that he held back when performing the straight leg raise maneuver bilaterally and that Plaintiff retained full strength. (Tr. 452). Dr. Matthews prescribed a Medral Dosepak and increased Plaintiff's pain medications to Lorcet 10. (Tr. 452). After reviewing Plaintiff's blood work and flexion-extension films, Dr. Matthews opined that there was good placement of the screws, good alignment at L5-S1, and normal blood work up. (Tr. 451). As such, Dr. Matthews, on November 11, 2003, advised a second surgery, an anterior lumbar interbody fusion. (Tr. 449).

Dr. Matthews opined that this "would help take the stress off the screws at the L5-S1 level where he has spondylolisthesis." (Tr. 449). In January 2004, Plaintiff underwent an anterior lumbar interbody fusion. (Tr. 514)

In February 2004, Plaintiff began seeing a new primary care physician, Dr. Charles Emerson, who prescribed a pain management referral for low back pain, Xanax for anxiety, and Accupril. (Tr. 575).

On March 1, 2004, Dr. Matthews opined that overall, Plaintiff had healed nicely from his second surgery and had good strength in his legs. (Tr. 514). Plaintiff reported that he did not feel like he had enough relief of his back pain to be able to return to his truck driving business and that he would be applying for disability. (Tr. 514). Dr. Matthews opined that given that Plaintiff was only three months postop from his surgery, Plaintiff still had a good chance of improving over the next nine months. (Tr. 514). Dr. Matthews placed Plaintiff on Lortab and Ultram, noting that Plaintiff's primary care physician also had him on Xanax. (Tr. 514).

Dr. Emerson continued the same treatment for Plaintiff from March 2004 through April 2005. (Tr. 559-575). Dr. Emerson continued to refer Plaintiff to a pain management clinic and also treated Plaintiff for allergies, anxiety, insomnia, sleep apnea and other various issues. Dr. Emerson prescribed various medications including Xanax, Ambien, Zyrtec, Viagra, Flonase, Lortel, Depo Testosterone injections, and Zocar. (Tr. 559-575).

On June 17, 2004, a second DDS physician, Dr. Saul Juliao, completed another PRFC, finding that Plaintiff was capable of lifting 50 pounds occasionally and 25 pounds frequently, standing and/or walking about 6 hours in an 8 hour workday, sitting about 6 hours in an 8 hour workday and was limited in his ability to push or pull with his upper extremities. (Tr. 507). Dr.

Jualio also opined that Plaintiff could frequently balance, kneel and climb ramps and stairs and could occasionally stoop, crouch, crawl, and climb ladders, ropes and scaffolds. (Tr. 508). Dr. Jualio further opined that Plaintiff was limited in reaching above shoulder level and in handling. (Tr. 509). Further, Dr. Jualio opined that Plaintiff would need to avoid concentrated exposure to vibration. (Tr. 510).

On October 20, 2005, Dr. Johan Culclasure, after examining Plaintiff, completed a Medical Source Statement of Plaintiff's Ability to Do Work-Related Activities, finding that Plaintiff could occasionally lift or carry ten pounds, could frequently lift or carry less than 10 pounds, could sit or stand at least 2 hours in an 8 hour workday, must periodically alternate sitting and standing to relieve pain or discomfort and is limited in pulling and pushing in both the upper and lower extremities. (Tr. 538-539). Further, Dr. Culclasure found that Plaintiff could occasionally kneel, crouch, crawl and stoop and could never climb or balance. (Tr. 539). Additionally, Dr. Culclasure found that Plaintiff was could only occasionally do, and was limited in, reaching all directions including overhead, handling, fingering and feeling. (Tr. 540). Dr. Culclasure found no environmental limitations. (Tr. 541).

On October 21, 2005, Plaintiff's treating physician, Dr. Emerson, completed a Medical Source Statement of Plaintiff's Ability to Do Work-Related Activities, finding that Plaintiff could occasionally lift and/or carry less than 10 pounds, frequently lift and/or carry less than 10 pounds, could stand or stand less than 2 hours in an 8 hour workday, could sit less than 6 hours in an 8 hour workday, and was limited in pulling and pushing in both the upper and lower extremities. (Tr. 551-552). Further, Dr. Emerson opined that Plaintiff should never climb, balance, kneel, crouch, crawl or stoop. (Tr. 552). Additionally, Dr. Emerson found that Plaintiff

16

was limited in reach all directions including overhead as well as in handle but was unlimited in fingering and feeling, finding that Plaintiff could occasionally do all four. (Tr. 553). Lastly, Dr. Emerson opined that Plaintiff had several environmental limitations, including temperature extremes, dust, vibration, humidity/wetness, hazards, fumes, odors, chemicals and gasses. (Tr. 554. In response to a document entitled Social Security Impairment Listing Questionnaire Vertebrogenic, Dr. Emerson checked "yes" that Plaintiff had a verbrogenic disorders such as herniated nucleus pulposus or spinal stenosis and also checked yes that Plaintiff had pain, muscle spasm and significant limitation of motion in the spine; and appropriate radicular distribution of significant motor loss with muscle weakness and sensory and reflex loss. (Tr. 555).[6]

### III. CONCLUSIONS OF LAW

#### A. Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exits in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner*, 105 F.3d

---

[6]Dr. Emerson also attached his treatment notes as previously discussed in this Report and Recommendation as his clinical findings supported this opinion.

17

244, 245 (6th Cir. 1996). Even if the evidence could also support a difference conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). However, if the record was not considered as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985).

### B. Proceedings at the Administrative Level

The Claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423 (d)(1)(A). At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

(1) If the claimant is working and the work constitutes substantial gain activity, benefits are automatically denied.

(2) If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

(3) If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[7] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry provided that the impairment meets the duration requirement.

_____

[7]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

18

determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (*e.g.*, what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

(5)     Once the claimant establishes a *prima facie* case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by providing the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

*Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the valuation process can be carried by relying on the medical vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination. *Id*. In such cases where the grids do not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert (VE) testimony. *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

19

In determining residual functional capacity (RFC) for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and non-severe. *See* 42 U.S.C. § 423 (d)(2)(B).

## C. Plaintiff's Statement of Errors

Plaintiff alleges one main error in the ALJ's decision: that the ALJ's decision to set the established onset date as May 1, 2004, was not supported by substantial evidence. Specifically, Plaintiff argues that the ALJ failed to determine that the Plaintiff had an injury which continued for more than 12 months prior to December 31, 2002,[8] failed to give proper weight to the opinions expressed by treating/examining physicians Dr. Emerson and Dr. Culclasure as well as other medical evidence beyond December 31, 2002, and lastly, failed to give appropriate weight to the July 2002 MRI results.

In *Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989)(per curiam), the Sixth Circuit set forth the principles necessary to determine the onset date of disability. After noting the progressive nature of many ailments, the Sixth Circuit held that the disability onset date must be inferred from the medical evidence that describes the history and symptomatology of a claimant's disease as well the claimant's allegations and work history. *Id.* at 1122 (citing Social Security Rule 83-20); *Besaw v. Secretary of Health and Human Services*, 966 F.2d 1028, 1030 (6th Cir. 1992). In cases contesting the onset date of disability, the issue is whether there is substantial evidence in the record to support the Secretary's findings of when a claimant's disability began. *Willbanks v. Secretary of Heath & Human Servs.*, 847 F. 2d 301, 303 (6th Cir. 1988)(per curiam). The claimant

---

[8]This is the undisputed date that Plaintiff's disability insurance expired.

must prove that he became disabled prior to the date selected by the Secretary. *Foster v. Bowen*, 853 F.2d 483, 489 (6th Cir. 1988). The Secretary is not required to refute evidence that another onset date of disability could have been chosen, *Blankenship* 874 F.2d at 1121, nor is the Secretary required to disprove any earlier onset date, as long as the Secretary's determination regarding the onset date is supported by substantial evidence. *Besaw,* 966 F.2d at 1030 (citing *Blankenship*, 874 F.2d at 1121). Therefore, in the instant case, the question is not whether Plaintiff is disabled but whether Plaintiff satisfied his burden of establishing that the date of his disability was prior to May 4, 2004. It is the Magistrate Judge's finding that Plaintiff has not met this burden.

While Plaintiff claims a disability relating back through 1999, the Magistrate Judge finds that substantial evidence supports the ALJ's finding that the record does not indicate a medically determinable impairment prior to September 11, 2000. Prior to this date, the only ailment being treated that is listed in Plaintiff's claim was sleep apnea. (Tr. 69). During later treatment, it was noted that Plaintiff's sleep apnea had been corrected by surgery and Plaintiff's medical records do not indicate that he complained of this ailment again on a regular basis after the surgery. (Tr. 235). Further, the ALJ is correct when stating that no doctor has attributed any significant limitations to sleep apnea. Therefore, the earliest possible date of disability would be the date of Plaintiff's work-related injury, September 11, 2000.

The Act defines "disability" as the inability to engage in substantial gainful activity because of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423 (d)(1)(A). Plaintiff was injured on September 11, 2000, and was released back to work by Dr. Oglesby on May 1, 2001. (Tr. 331). Throughout that approximately eight month period, Plaintiff's main complaint was of

21

shoulder and neck pain. Plaintiff's treatment began with Dr. Cushman who opined that while the MRI of the neck shows some minor degenerative changes but specifically no evidence of a herniated disc or acute injuries, the CT scan of the lumbar spine showed some mild to moderate spinal stenosis and degenerative changes but certainly nothing acute, and that the EMG showed a mild, left carpal tunnel syndrome, Plaintiff's subjective complaints "seem to be somewhat out of proportion to the physical findings." (Tr. 231). On December 1, 2000, Dr. Cushman noted that while Plaintiff still complained of a lot of neck pain, an MRI scan of the cervical spine and brachial plexus revealed no significant abnormalities. (Tr. 224). Dr. Cushman further reported that while the MRI scan of the shoulder was positive, Plaintiff seemed to have a lot of complaints that where not supported by objective findings. (Tr. 224). In spite of these opinions, Dr. Cushman referred Plaintiff to Dr. Oglesby who treated the Plaintiff for several months with one surgery and physical therapy before releasing him to work.

At the time of this release, Dr. Oglesby noted that Plaintiff's "shoulder is doing great" and that Plaintiff could "work without restrictions." (Tr. 331). Further, throughout his treatment, Dr. Oglesby found that Plaintiff had "done very well in therapy" and that from a shoulder standpoint [Plaintiff] could work without restrictions." (Tr. 333). Further, Dr. Oglesby found that while Plaintiff continued to complain about increasing pain in his shoulder, x-rays did not show any reformation of calcium deposition and there were no objective signs of a problem that would explain his pain. Further, Dr. Oglesby found that Plaintiff had an excellent range of motion. (Tr. 332). It was based upon these opinions, thereby disregarding Plaintiff's subjective allegations of pain, that Dr. Oglesby released Plaintiff to work without restrictions on May 1, 2001.

Plaintiff did injure the same shoulder on May 8, 2001, approximately one week after

returning to work. (Tr. 328-330). Plaintiff argues that this injury should continue the 12 month duration requirement as another injury to the same shoulder within such a short period of time makes Plaintiff's work attempt unsuccessful. However, it is clear from the treatment notes of Dr. Oglesby that, as of May 1, 2001, his opinion was that Plaintiff's shoulder was fully healed and that Plaintiff should be released to work without restrictions. The fact that Plaintiff injured the same shoulder shortly after returning to work does not, in and of itself, demonstrate that Plaintiff's initial injury had not healed or that Plaintiff had not fully recovered. Plaintiff has not cited to any evidence which establishes that the second shoulder injury was somehow a continuation of the initial injury. In fact, the treatment notes indicate the exact opposite, i.e. that the shoulder was fully healed as of May 1, 2001. As such, substantial evidence supports the ALJ's finding that the record does not indicate a medically determinable impairment through May 1, 2001, as Plaintiff was released to full work within approximately eight months after his initial injury, nowhere near the 12 month duration requirement. 20 C.F.R. § 404.1509.

As for Plaintiff's second shoulder injury as well as his carpal tunnel surgery, there is substantial evidence in the record which supports the ALJ's decision that these ailments also did not meet the 12 month duration requirement. Plaintiff injured his shoulder again on May 8, 2001. On May 30, 2001, Dr. Oglesby opined that the MRI, which was not performed with gadolinium so the accuracy was somewhat compromised, did not show any evidence of additional nerve damage, although there was some concern about the labrum. (Tr. 328). Dr. Oglesby further noted that the rotator cuff appeared to be intact. (Tr. 328). However, Plaintiff's reported pain did not improve so on June 21, 2001, Dr. Oglesby performed additional surgery, finding "no evidence of new internal injury to the joint, just the AC joint injury." (Tr. 326). Throughout July and August 2001, Dr.

23

Oglesby noted that Plaintiff was "doing very well" in physical therapy and was "delighted with the motion he exhibits actively and passively." (Tr. 323). In October 2001, Plaintiff was reported to be lifting 50 pounds up to shoulder height in repetition and that he had only mild shoulder soreness and near full strength. (Tr. 320). As such, Dr. Oglesby referred Plaintiff for a functional capacity evaluation with physical therapist David Davenport who noted that Plaintiff "was self-limited on most of the material handling activities" and that, as Plaintiff did not demonstrate a full and consistent effort, he was unable to determine Plaintiff's actual level of work ability. (Tr. 254, 254-260). Mr. Davenport noted that the pain rating indicated by the Plaintiff "did not appear to correlate with the degree of muscle guarding and postural deviation exhibited." (Tr. 254, 260). Based upon this evaluation, Dr. Oglesby released Plaintiff to work in December 2001, approximately seven months after his second shoulder injury, with a permanent lifting limit of 50 pounds maximum, 50 pounds floor to waist, 30 pounds waist to chest, and 12 pounds overhead and the ability to drive heavy equipment. (Tr. 318-319).

As for Plaintiff's carpal tunnel ailment, surgery was performed by Dr. Bacon on September 19, 2001. (Tr. 238). On September 25, 2001, Dr. Oglesby noted Plaintiff's left carpal tunnel surgery was an "excellent early resolution of his hand symptoms." (Tr. 321). Further, throughout the end of September 2001 through November 2001, Plaintiff reported to Dr. Bacon that his fingers no longer felt numb, that his hand felt a lot better, and that he could move his hand all the time. (Tr. 250-251). Further, on November 6, 2001, Plaintiff reported that he no longer had an difficulty with his hand and that his only problem now was his left shoulder. (Tr. 247). Dr. Bacon observed that Plaintiff had good sensation in all fingers, good grip strength, and a fully range of wrist and finger motion. (Tr. 247-248).

Based upon the above, substantial evidence supports the ALJ's determination that neither Plaintiff's second shoulder injury nor his carpal tunnel ailment were medical determinable impairments satisfying the 12 month duration requirement. The ALJ correctly noted that Dr. Oglesby's limitations were not supported by any objective evidence. The assessment of Plaintiff's ability was noted to be a "self-limited performance" and Plaintiff's subjective complaints of shoulder pain were continuously noted to have no objective medical evidence support. Therefore, it is clear that the ALJ's determination that Plaintiff's second shoulder injury did not meet the duration requirement is supported by substantial evidence as the injury occurred on May 8, 2001, and Plaintiff was released to work in December 2001. Additionally, the first records indicating that Plaintiff had any carpal tunnel ailment was on November 17, 2000. At that time, an EMG showed mild, left carpal tunnel syndrome. (Tr. 230). There is no indication in the record that this mild syndrome prevented Plaintiff from working. Further, medical evidence establishes that by November 6, 2001, Plaintiff reported that he no longer had an difficulty with his hand. (Tr. 247).

At this point, the remaining ailment relates to Plaintiff's back. Plaintiff argues that the ALJ should have accorded more weight to the July 2002 MRI of Plaintiff's cervical and lumbar spine which revealed "very mild degenerative changes with no acute injury noted." and "mild multilevel degenerative disc disease changes" with "no acute injury noted." as well as mild degenerative changes with the most pronounced findings of a mild central spinal stenosis at L2-L3 and clustered fluid signal collections at the facet joint level at L4-L5. (Tr. 428). Plaintiff argues that these results, while having been noted by both the performing radiologist as well as treating physician Dr. Bain to be of "doubtful clinical significance," were substantiated by the near identical results of a

25

February 2003 MRI. (Tr. 428). Further, Plaintiff argues that the opinions of Dr. Emerson and Dr. Culclasure as well as Plaintiff's treatment records after December 31, 2002, should have been accorded at least some weight by the ALJ when determining whether Plaintiff was disabled by the DLI date.

The Magistrate Judge finds that the Plaintiff has not satisfied his burden of proving that the date of his disability was prior to May 4, 2004. The MRI results in July 2002 are in fact similar to the results in February 2003. However, the Magistrate Judge is unclear as to how this would assist the Plaintiff in meeting his burden. Based upon the February 2003 results, Plaintiff was subjected to non-surgical treatment, including a back brace and a period of rest. It was not until three months after the second MRI and five months after the DLI date that Plaintiff underwent back surgery on May 29, 2003. (Tr. 390-392). Additionally, less than three months after this surgery, Plaintiff reported that he was "at least 50 % better with regards to back pain" and took only the occasional Lortab. (Tr. 453). Further, Plaintiff's treating physician Dr. Matthews noted that he was pleased with Plaintiff's progress, that Plaintiff could discontinue using his back brace and that Plaintiff had full strength of his lower extremities. (Tr. 453). Further, on October 6, 2003, after reviewing Plaintiff's blood work and flexion-extension films, Dr. Matthews opined that there was good placement of the screws, good alignment at L5-S1, and normal blood work up. (Tr. 451). Approximately eight months after the first surgery and approximately one year after his DLI, Plaintiff underwent a second back surgery. Dr. Matthews opined that this second surgery "would help take the stress off the screws at the L5-S1 level where he has spondylolisthesis." (Tr. 449). The Magistrate Judge would note that prior to this point, the record, specifically the July 2002 and February 2003 MRIs, indicate that Plaintiff did not have spondylolisthesis at the L5-S1 level,

demonstrating the degenerative nature of his condition. (Tr. 470, 475). In January 2004, Plaintiff underwent an anterior lumbar interbody fusion. (Tr. 514).

The Plaintiff has provided no interpretation of how this evidence establishes that Plaintiff had a disability prior to May 2004. As it stands, the evidence demonstrates the conservative treatment as a result of the February 2003 MRI as well as the degenerative nature of Plaintiff's condition. Further, while Plaintiff argues that the medical assessments of Dr. Emerson and Dr. Culclasure should have been given substantial weight, these evaluations were completed approximately 3 years after Plaintiff's DLI and took into account all of Plaintiff's treatment during that time, including his numerous back surgeries. Further, neither of these physicians treated the Plaintiff until 2004, well past the DLI date. As such, the Plaintiff has not provided any argument as to how these opinions would change the established onset date. Further, the ALJ also disregarded the opinions of Dr. Burr and Dr. Juliao which conflicted with those of Dr. Emerson and Dr. Culclasure and supported his decision for the same reason. Additionally, as the record is replete with references of how Plaintiff's subjective complaints of pain were not supported by objective medical evidence, there was substantial evidence to support the ALJ's determination of Plaintiff's credibility. (Tr. 224, 230, 231, 254, 331, 332, 407, 408). Given the above, the Plaintiff has not met his burden of establishing an earlier onset date and substantial evidence supports the ALJ's determined onset date.

## IV. RECOMMENDATION

In light of the foregoing, the Magistrate Judge recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner

be AFFIRMED.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objection to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004 (en banc).

ENTERED this 22nd day of May, 2008.

JOE B. BROWN
United States Magistrate Judge